186 N.J. Super. 576 (1982)
453 A.2d 279
GABRIELLE NAPOLITANO, PLAINTIFF,
v.
THE TRUSTEES OF PRINCETON UNIVERSITY, WILLIAM G. BOWEN, INDIVIDUALLY AND AS PRESIDENT OF PRINCETON UNIVERSITY, PETER ONEK, INDIVIDUALLY AND AS ASSISTANT DEAN OF STUDENT AFFAIRS OF PRINCETON UNIVERSITY, AND SYLVIA MOLLOY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Mercer County.
Decided from bench June 2, 1982.
Supplemented June 30, 1982.
*578 Nathan M. Edelstein for plaintiff (Brener, Wallack & Hill, attorneys).
William J. Brennan, III for defendants (Smith, Stratton, Wise, Heher & Brennan, attorneys).
DREIER, J.S.C.
Plaintiff instituted this action to compel defendant Princeton University to issue her Bachelor of Arts degree at its regular June commencement exercises, and for other incidental relief. Defendant maintained that as a result of a decision of its Committee on Discipline, which was confirmed by the university president, plaintiff's degree was to be withheld for the period of one year as penalty for her infraction of the university's regulations relating to academic fraud. The university contends that plaintiff plagiarized the bulk of a 12-page term paper, written in Spanish, and submitted in Spanish 341 (The Spanish American Novel) as a critical review of Cien anos de Soledad (100 years of Solitude) by Gabriel Garcia Marquez. Plaintiff, a student with a previously spotless record and a 3.7 cumulative grade point average, admitted the presence in her term paper of long passages quoted without attribution from Cien anos de Soledad: una interpretation, by Josefina Ludmer ("Ludmer"), but claimed *579 that this did not constitute plagiarism within the definition of that offense in the Princeton handbook, "Rights, Rules and Responsibilities" (1980).
By way of defense before the Committee on Discipline, the university president, Dr. Bowen, as well as this court, plaintiff explained that she had cited the Ludmer source five times in footnotes and once in the text, but had failed to use quotation marks or other textual or footnote citations for the bulk of the disputed material, determining the same to have been unnecessary. She noted that the Ludmer book had been placed on reserve for her by her Spanish professor, who had suggested she use that source as the basis for her paper; therefore, she knew that the professor was familiar with the volume in question. Plaintiff explained that she speaks and writes only halting Spanish, and had taken the course, not because she needed the credits for her degree (she was an English major), but merely to become more familiar with Spanish literature. She expected that her extensive quotations from Ludmer would immediately be recognized, since the grammatical structure and flowing style were clearly beyond her capability in written Spanish. Plaintiff admitted that she produced a poor paper and perhaps deserved to fail the particular assignment, but steadfastly maintained that she had no intent to deceive her professor  she merely failed to follow the prescribed rules as to the use of quotation marks or other attribution references.
The student handbook recites that the usual penalty for academic fraud is "one year's suspension or required withdrawal from the University." This court has reviewed many of the disciplinary files (after requesting the deletion of the students' names to preserve anonymity), and has found that the actual penalties ranged from 20 days disciplinary probation (until graduation, for an offense that was adjudicated at the end of a student's senior year) to explusion (for the submission of a paper wholly plagiarized from an obscure source). Far from being uniform, the penalties appeared to be imposed on an ad hoc *580 basis, with suspension (or the withholding of the degree for seniors) being the exception rather than the rule.
The case was first presented to this court as an emergent matter because of the proximity of graduation, which was scheduled for June 8, 1982. Initially, the court requested that the attorneys go back to their clients and try to resolve the case without the necessity of adjudication, and with due recognition of the university's own practices and plaintiff's theretofore exemplary record. When the case was reported back as not subject to settlement, the court ordered accelerated depositions and prepared to process the matter on an expedited basis, scheduling the first formal hearing for the last week in May.
At this hearing the court considered the procedures followed by the university in dealing with plaintiff's alleged offense  specifically, did the university comply with its own rules and regulations? At issue initially was the definition of plagiarism. The university had applied a definition which held as irrelevant the student's intent (or lack thereof) to deceive the reader. Plaintiff urged that the history of the handbook definition demonstrated that intent was not only relevant but central to the concept of plagiarism. In the 1978 edition of "Rights, Rules and Responsibilities" there had been an exception under "defenses" stating that the absence of intent was not a defense, and the word "deliberate" was not included in the basic definition of plagiarism. In the 1980 edition the "absence of intent" phraseology was deleted and a new definition of plagiarism was added:
PLAGIARISM. The deliberate use of any outside source without proper acknowledgement. "Outside source" means any work, published or unpublished, by any person other than the student. [Emphasis supplied].
The second procedural issue related to the ability of plaintiff to present both fact and character witnesses in her own behalf. She had been permitted to call any fact witness but the university had limited character witnesses to those from the Princeton University community whose names appeared in the Centrex directory. The handbook, however, provided that "the student has an opportunity to present his or her case and any witnesses *581 desired for his or her defense" (Emphasis supplied). Plaintiff had sought but was denied permission to present character witnesses who no longer were members of the Princeton community but were familiar with plaintiff's character.
Next, plaintiff claimed that she had not been told that she had the right to cross-examine any witnesses who would appear against her. She claimed that, although she had been told by an Assistant Dean that she could present her own case, he neglected to inform her that she had a right of cross-examination, as provided in the student handbook.
As her last procedural claim, plaintiff contended that she had been denied the right to counsel before the committee. Here, she acknowledged that the university followed its own regulations, but asserted that these were unconstitutional insofar as they limited plaintiff to an advisor (who may or may not be an attorney) from within the university community, but did not permit the appearance of outside counsel. The result of these infractions, she claimed, was an unwarranted determination of guilt, and an excessive penalty, considering the nature of the offense, her own record and penalties imposed in similar cases.
This court remanded the matter to the Committee on Discipline for a rehearing to be held during the first week in June, but retained jurisdiction to review the action of the committee during the same week. The committee was directed to apply the 1980 definition of plagiarism, this court noting specifically that the use of the word "deliberate," and the removal of the "absence of intent" language dictated that the proscribed plagiarism must have been with the intent to pass off the submitted work as the student's own. In addition, the committee was directed to permit plaintiff to call any witnesses she wished on her own behalf, subject only to reasonable regulation by the presiding officer (under rules similar to Rule 4 of the New Jersey Rules of Evidence), and that she be afforded the right to cross-examine any witnesses presented against her.
*582 As to the right to counsel, this court reviewed both the federal and state authorities submitted, especially the case of Garrow v. Elizabeth Gen'l Hosp. & Dispensary, 79 N.J. 549, 566-567 (1979), and balanced the several factors governing the right to counsel. Among these were the absence of counsel representing the complainant or university at the hearing, the university's practice of permitting the student to select an advisor from within the Princeton University community, the academic nature of the matter in dispute and the probable punishment that could reasonably attend a determination of plaintiff's guilt. In Garrow our Supreme Court permitted a physician to have his attorney present at a staff affiliation hearing. Princeton, however, is not a quasi-public institution as was the hospital in Garrow. The rights of the public to have a particular physician on a hospital staff, and the substantial potential property rights of the physician himself, apparently tipped the balance in Garrow in favor of the right to counsel. The academic hearing in the present case was of a different nature.[1] Were the court to enforce a right to counsel in such a situation, the academic community's control over its own affairs would be unjustifiably limited. This court recognizes, however, that there may be academic areas where the right to counsel might properly be mandated. In Rodriguez v. Rosenblatt, 58 N.J. 281 (1971), counsel was required even in municipal court, in cases where an indigent defendant is faced with an actual threat or likelihood on conviction of "imprisonment in fact or other consequence of magnitude" (at 295). However, given the history of penalties actually rendered in plagiarism cases where there had been no "palming off" of an obscure source as the student's own work, there was little likelihood that the hearing would have resulted in plaintiff's suffering any forfeiture, i.e., expulsion, with the resultant loss of her four-year investment of time and money, or immediate *583 suspension, with a similar loss of a semester's time and expenses. Whether in such forfeiture cases a sufficient right might exist was not before the court, and, therefore, this court expresses no opinion on the right to counsel in academic forfeiture situations.
The committee held its rehearing pursuant to this court's direction and reaffirmed its original decision to withhold plaintiff's degree for one year. Plaintiff's appeal to President Bowen was similarly unavailing, and the matter was returned before this court for hearing on June 2, 1982.
Two issues remain: first, was there sufficient evidence before the Committee on Discipline and President Bowen to justify the findings of plagiarism and, second, was the penalty appropriate? As to the first issue, it was unnecessary for the court to decide whether the standard of review was to be "some evidence" (see Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975)); "substantial evidence" (see Slaughter v. Brigham Young Univ., 514 F.2d 622 (10 Cir.1975); Sill v. Pennsylvania State Univ., 318 F. Supp. 608 (M.D.Pa. 1970)), aff'd 462 F.2d 463 (3 Cir.1972); "sufficient reliable evidence" (see Garrow, supra 79 N.J. at 565), or "preponderence of the evidence" (generally used in civil trials). Whichever test might be used, there is no question, from plaintiff's extensive use of unattributed material, that the committee was justified in concluding that she committed the offense with the intention to pass off the quoted material as her own. Although the committee might well have found, if it believed plaintiff's claim, that the offense was merely an unintentional academic infraction (defined in the handbook as one which did not involve fraud), the evidence was sufficient, when measured against any of the above quoted standards, to uphold the decision of the Committee on Discipline. Thus this court, as a court of review, will apply the doctrine of judicial abstention and refuses to disturb the findings of the committee.
As to the issue of the penalty, a harder problem is presented. A court may not substitute its own views for those *584 of a duly constituted administrative body within a private institution. It may not act as a governmental overseer, except where judicially cognizable issues call for its intervention to protect the rights of an individual or the public.
Here we have a breach of contract issue: Whether the assessment of the penalty violates Princeton's agreement to award the Bachelor's degree if plaintiff complied with the university's rules and regulations. See Clayton v. Princeton Univ., 519 F. Supp. 802 (D.N.J. 1981). This court must determine whether this contract between plaintiff and defendant has been breached by the severity of the penalty assessed. However, in matters of interpreting and enforcing the contract between the parties, the university has broad discretion  a discretion to which plaintiff submitted herself when she enrolled at Princeton. In determining whether there has been a breach of contract, the legal standard against which the court must measure the university's conduct is that of good faith and fair dealing, for, as noted by our Supreme Court in Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182 (1981): "[i]n every contract there is an implied covenant of good faith and fair dealing."
As this court has noted in prior hearings and conferences, Princeton might have viewed the matter of the penalty with a greater measure of humanity and magnanimity, with a greater recognition of the human frailities of students under stress, as the university apparently has done in many cases in the past.[2] This court cannot mandate compassion, however, and will not, nor should not, engraft its own views on Princeton's disciplinary processes, so long as the standard of good faith and fair dealing has been met and the contract between the student and the *585 university has not otherwise been breached. Accord, Wood v. Strickland, supra, and Higgins v. American Society of Clinical Pathologists, 51 N.J. 191, 202 (1968). Private institutions must remain free of inordinate government  in this case judicial  control.
Plaintiff has argued that the penalty assessed was excessive in view of three factors: first, her exemplary performance at Princeton in all spheres of university life, and the spotless record she had established up until and since this single episode[3]; second, the nature of the alleged plagiarism itself, and her defense of lack of intent; and third, the history of the past treatment of students with similar offenses and backgrounds. She points out with particularity the many cases in which disciplinary probation had been given for similar offenses with students having far worse academic and disciplinary records than hers, and notes that even if the degree were to be withheld, a four-month withholding period was more usual than the one-year penalty imposed in her case. Against these arguments, Princeton urges that withholding plaintiff's degree for one year is not an excessive penalty since this was a grievous case of plagiarism, namely, extensive use of unattributed material with an intent to deceive. Furthermore, this punishment is less onerous than that stated as usual (though in actuality rarely imposed) in the university's regulations  suspension for one year or required withdrawal from the university. In addition *586 Princeton points to several precedents for the penalty assessed here, and urges that there is no requirement that punishment be uniform in matters of discipline within a private academic institution. Lastly, Princeton contends that it is permitted to take such action to uphold its academic integrity as one of the world's leading institutions of higher learning.
However this court personally may view the penalty imposed,[4] the proper role of a court is to permit private organizations to govern their own affairs, unless the court's intrusion is warranted by conduct so egregious as to constitute a breach of the parties' agreement. To upset Princeton's decision here, this court would have to find that Princeton could not in good faith have assessed the penalties it did against plaintiff. This court cannot do so, in view of its understanding of the proper role of a court  even a court of equity. Judicial restraint is called for, and therefore, this court will not modify the penalty imposed by Princeton.[5]
Summary judgment is hereby granted dismissing the complaint.
NOTES
[1] Cf. the practice followed in prison discipline cases of allowing another inmate to serve as advisor to a prisoner appearing at a disciplinary hearing. N.J. State Parole Bd. v. Woupes, 184 N.J. Super. 533, 535 (App.Div. 1982).
[2] This observation is based on the court's detailed examination, as noted earlier, of over 20 disciplinary files, as well as its review of a table of some 78 cases of academic fraud (mainly plagiarism) and the penalties imposed therefor at Princeton over the past four years.
[3] Apart from the infraction that is the subject of this case, plaintiff's record has been spotless, both academically and in extra-curricular areas. An athlete, plaintiff had been injured in her freshman year and therefore could not continue as a participant in the sports programs. She immediately took on responsibilities as team manager, and in many other areas devoted herself selflessly to Princeton, earning recognition from students, professors, the athletic department and others in the Princeton community. Recommendations presented to the Committee on Discipline were filled with superlatives describing her character, academic achievements and devotion to Princeton. One professor noted her to be the single finest student with whom he had become acquainted during his tenure at the university.
[4] The court notes that there were alternative punishments available. Disciplinary probation was the usual penalty in most plagiarism cases, even for seniors. However, if Princeton found plaintiff's offense to be particularly grievous, thus meriting a greater penalty than disciplinary probation, the university could have withheld plaintiff's degree until just after her class had graduated, thus preventing her from attending the graduation ceremonies, or until September, which still would have permitted her to start graduate school in the fall. Although plaintiff still retains the right to her Princeton degree, which will be awarded in June 1983, she has lost a year of academic life; but as noted earlier there is no forfeiture of her investment in her degree since she was neither expelled nor suspended.
[5] Plaintiff had sought as additional relief an injunction against Princeton's giving notice of its plagiarism adjudication to any law school to which plaintiff had applied. The notoriety deriving from this case, however, marks plaintiff's record more permanently than anything that defendant might place upon her transcript. Therefore, her argument that there should be no such notification or notation is moot at this point.